IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Thomas John Malusa | No. CV 07-655-TUC-CKJ (CRP) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| vs. | |
| Michael J. Astrue, Commissioner of Social Security, | |
| Defendant. | |

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision by the Commissioner of Social Security ("Commissioner"). This case presents three issues on appeal: (1) whether the Administrative Law Judge ("ALJ") improperly evaluated Plaintiff's physical condition; (2) whether the ALJ improperly evaluated Plaintiff's mental condition; and (3) whether the ALJ erred in determining Plaintiff could perform his past relevant work. Based on the pleadings of the parties and the administrative record submitted to the Court, the Magistrate Judge recommends that the District Court, after its independent review, DENY Plaintiff's Motion for Summary Judgment (Doc 7) and GRANT Defendant's Cross-Motion for Summary Judgment (Doc 13). The record establishes the ALJ properly determined Plaintiff's mental and physical condition and properly determined Plaintiff could return to his past relevant work.

**Procedural History**

Plaintiff filed an application for Social Security Disability Insurance Benefits ("DIB") in October 2004. (Administrative Record ("AR") 167, 173). Plaintiff alleged disability since January 4, 2004, due to back pain and spasm stemming from a motor vehicle accident on that date. (AR 102, 111, 167, 173). Plaintiff also alleged depression and anxiety deriving from and exacerbated by the accident. (AR 102, 111, 167, 173). After the Social Security Administration ("SSA") denied Plaintiff's application, Plaintiff requested a hearing before an ALJ. (AR 100, 102, 111). Two hearings were held before ALJ Norman Buls, one in January 2006 and the second in March 2006. (AR 31-60, 61-89). The ALJ then rendered his decision in August 2006 that Plaintiff was not disabled at step four. (AR 29-30).

Subsequently, Plaintiff requested review by the Appeals Council and submitted a memorandum alleging errors by the ALJ in the administrative hearings. (AR 12-13, 528-572). The Appeals Council denied Plaintiff's appeal and the ALJ's decision became the Commissioner's final decision on November 9, 2007. (AR 5). *See* 20 C.F.R. § 404.981. Plaintiff then initiated this civil action on December 11, 2007. (Doc 1).

**Factual History**

Plaintiff was born on April 21, 1955, making him forty-nine years old on his alleged onset of disability and fifty-one years old on the date of the ALJ's decision. (AR 30, 167). From 1987 through October 2002, Plaintiff worked as president and sole shareholder of TM Building and Development, a restoration company. (AR 35, 248, 256). Plaintiff's management duties were extensive. Working as president of the company, Plaintiff supervised as many as fifty to seventy employees, hired and fired employees, made bids on prospective jobs and wrote reports. (AR 55, 248-249, 256-257). He describes managing an office of ten to fifteen employees, thirty-five to forty-five field employees and approximately ten to fifteen subcontractors at any given time. (AR 216). While Plaintiff stated he stood and/or walked for significant periods of the day, and also carried ladders and lifted a hundred pounds occasionally and fifty pounds frequently, Plaintiff stated ninety percent of his time was spent supervising people. (AR 249, 257).

1    In October 2002, Plaintiff sold his business for 1.6 or 1.7 million dollars. (AR 86).
2 Plaintiff states he intended to take a year off from working before venturing into another
3 construction business on a smaller scale. (AR 40, 80). At the end of the following year
4 Plaintiff states he began getting bored and explored purchasing a property to restore. In
5 January 2004, Plaintiff found and purchased a ten apartment complex. (AR 25, 40). Within
6 one week of Plaintiff purchasing the complex, he had a motor vehicle accident in Mexico.
7 (AR 50, 373).

8    Plaintiff describes swerving to avoid animals in the road while traveling
9 approximately 60 mph. (AR 50, 373). He was wearing a seatbelt but he hit a concrete wall
10 or metal guardrail. (AR 51). A CT scan in February 2004 showed Plaintiff suffered a L2
11 burst fracture ("L2 fracture") from the accident. (AR 364). The L2 fracture caused a 20-
12 30% loss of height in Plaintiff's L2 vertebral body but there was no significant central canal
13 stenosis and no significant bony retropulsion. (AR 364). In the initial evaluation of
14 Plaintiff, the CT scan revealed that Plaintiff's alignment was within normal limits with no
15 significant anterior or posterior subluxation. (AR 364). Eight months later, in December
16 2004, an MRI showed a "compression fracture of the L2 vertebral body which appears to
17 have healed." (AR 451). The same MRI revealed no significant central or foraminal
18 compromise and no significant retropulsion. (AR 451). It also revealed no evidence of a
19 focal disc protrusion and no significant central canal stenosis. (AR 451).

20    In spite of the accident, Plaintiff proceeded to manage the restoration of the complex
21 for the next twenty-two months. (AR 83, 81). Plaintiff hired workers to do the manual labor
22 for the restoration but Plaintiff managed the finances, including paying the bills, and made
23 the management decisions regarding the project. (AR 81-83, 79). Plaintiff sold the complex
24 in October 2005, making a $50,000 profit that he divided equally with his wife. (AR 81).

25    For his back injury, Plaintiff was initially referred to orthopedic surgeon and spine
26 specialist, Dr. Jeffrey Baron, who discussed with Plaintiff operative and non-operative
27 management of the L2 fracture. (AR 371-372). Dr. Baron opined that either option,
28 operative or non-operative, would be a reasonable choice of treatment for Plaintiff's injury.

- 3 -

1  (AR 372).  Dr. Baron described Plaintiff's injury as "moderate severity."  (AR 359).
2  Plaintiff also sought a second opinion from another orthopedic surgeon, Dr. Stephen Hanks.
3  (AR 369).  Dr. Hanks observed Plaintiff as "able to ambulate in the room . . . exhibit[]
4  normal gait and tandem . . . [and] crawl on and off the examination table without
5  difficultly."  (AR 369).  Dr. Hanks also diagnosed the L2 fracture but noted only "a
6  minimally pressed L2 wedge fracture" with "no canal encroachment" and recommended
7  non-surgical therapy.  (AR 369-370).  Dr. Hanks noted Plaintiff had "no real palpable
8  tenderness over the thoracolumbar junction," although Plaintiff did have "[a] little bit of
9  paraspinal muscle spasm in the upper lumbar spine."  (AR 369).  Dr. Hanks noted Plaintiff
10 was improving since the date of injury and Plaintiff was "having less back pain than when
11 he first started."  (AR 369).  Dr. Hanks opined "I think this will completely resolve for him."
12 (AR 369).  Dr. Hanks did not recommend surgery because he saw "nothing to operate on."
13 (AR 370).
14       Plaintiff pursued conservative treatment with Dr. Baron's oversight.  (AR 351-359).
15 Plaintiff underwent physical therapy, took medication and was advised to slowly increase
16 his activities.  (AR 351-359).  In March 2004, Dr. Baron through his nurse practitioner
17 Elizabeth Thomas, described Plaintiff as "appear[ing] to be in no acute distress" with
18 "ambulation upright and steady" although he did have "point tenderness over the L2 area."
19 (AR 355).  Dr. Baron described Plaintiff as improving, noting Plaintiff "has done well since
20 I saw him last, with some improvement in his pain" and "ambulation ... within normal
21 limits."  (AR 356).  Dr. Baron did advise Plaintiff that his injury may be a "chronic pain
22 generator" and that Plaintiff would be unable to do any "heavy lifting type activity and any
23 true manual labor activity for up to one year from the date of his injury."  (AR 354).  In July
24 2004, Plaintiff again saw Dr. Baron and expressed frustration with his slow progress.  Dr.
25 Baron's nurse practitioner noted Plaintiff "has difficultly adjusting to the fact that his
26 activity level has decreased significantly."  (AR 351).  Plaintiff was encouraged to "stay as
27 active as possible."  (AR 351).
28

1    Dr. Baron also suggested Plaintiff see a pain management specialist and in July 2005, Plaintiff's general practitioner referred Plaintiff to Dr. Bennet Davis for that purpose. (AR 282-283). Dr. Davis observed Plaintiff was "a pleasant somewhat anxious gentleman who appears in no distress." (AR 282). During the examination Plaintiff "move[d] in a fluid motion about the clinic without difficulty." (AR 282). Dr. Davis referred Plaintiff to his medical psychology group to help with his possible OCD and long-term treatment of pain. (AR 283). He also prescribed Plaintiff low dose pain medication and sleeping aids. (AR 283).

A State agency physician reviewed the record in May 2005 and opined Plaintiff retains the ability to perform light work. (AR 295-302). The physician determined Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for six hours of an eight hour workday, and sit for six hours out of an eight hour workday with periodic shifting from sitting to standing positions. (AR 296). The physician did limit Plaintiff's ability to climb ramps or stairs only occasionally and to never climb ladders, ropes, or scaffolds. (AR 297). Plaintiff has a history of bronchitis and allergies and the physician determined Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation as well as hazards like machinery. (AR 299, 461-464).

In addition to seeking help for his back injury, Plaintiff has sought help for psychological difficulties. Plaintiff began seeing psychologist Dr. Patricia Volkerts in January 2003 for marital therapy with his wife and individually. (AR 337). When marriage therapy ended in December 2003, Plaintiff continued seeing Dr. Volkerts for individual therapy. Dr. Volkerts wrote a letter to the Arizona Department of Economic Security ("DES") in December 2004. While Dr. Volkerts diagnosed Plaintiff with obsessive-compulsive disorder ("OCD") for which he took medication, Dr. Volkerts opined Plaintiff was not disabled by his psychological symptoms. (AR 337). Dr. Volkerts also noted Plaintiff "reported ongoing problems with pain as a result of his injuries [from the motor vehicle accident]." (AR 337).   In the same month of December 2004, Dr. Volkerts completed a Medical Source Statement ("MSS") opining about Plaintiff's ability to do work

1 related activities. (AR 338). Dr. Volkerts found Plaintiff moderately limited in his ability to
2 accept instructions and respond appropriately to criticism from supervisors as well as get
3 along with coworkers or peers without distracting them or exhibiting behavioral extremes.
4 (AR 340). In the other eighteen categories assessing the ability of a person to work, Dr.
5 Volkerts opined Plaintiff had no evidence of limitation or was not significantly limited in his
6 abilities. (AR 338-341). Five months later, in April 2005, Dr. Volkerts completed a
7 Psychiatric Review Technique Form ("PRTF") and a Mental Work Tolerance
8 Recommendations Form. (AR 321-329).

9 On the forms, Dr. Volkerts checked the box stating Plaintiff's impairment was not
10 severe. (AR 321). In the notes, Dr. Volkerts stated Plaintiff "has both obsessive thoughts
11 and compulsive behavior." (AR 322). Dr. Volkerts opined Plaintiff's ability to cope with
12 his mental problems is "significantly hindered" by his physical injury because his former
13 activities for coping with his anxiety and obsessive-compulsive symptoms are no longer
14 available to him. (AR 322). In the same PRTF, Dr. Volkerts identified moderate limitation
15 in Plaintiff's social functioning and concentration, persistence, or pace resulting in failure to
16 complete tasks in a timely manner in work settings or elsewhere. (AR 328). On the work
17 tolerances form, Dr. Volkerts opined Plaintiff was moderately limited in his ability to
18 maintain concentration, perform activities within a schedule, work in coordination with
19 others, make simple work-related decisions, complete a workday and workweek with normal
20 rest periods, respond appropriately to changes in environment, and set realistic goals or
21 make plans independently of others. (AR 330-332). Dr. Volkerts opined Plaintiff was not
22 significantly limited or mildly limited in the other fourteen categories. (AR 330-332).

23 In May 2005, state reviewing psychologist Dr. Paul Tageman reviewed Plaintiff's
24 record and noted Dr. Volkert's opinions from December 2004 and April 2005 were
25 "incongruent with one another and not substantiated by the record." (AR 305). Dr.
26 Tageman noted Plaintiff's OCD may interfere to some extent with Plaintiff's CPP functions
27 but not to the extent as to preclude substantial gainful activity. (AR 305). Dr. Tageman also
28

opined Plaintiff "retains the ability to sustain basic work tasks in a low stress situation that is not fast paced." (AR 305).

In November 2005, Dr. Shannah Biggan performed a neuropsychological evaluation of Plaintiff. (AR 478-487). Dr. Biggan performed a standardized test of intellectual function (WAIS-III) on which Plaintiff's scored within the average range of function relative to his peers. (AR 480). Dr. Biggan found Plaintiff exhibited "the average range of intellectual function, although there is significant difference between his verbal and nonverbal intellectual skills." (AR 483). Plaintiff "demonstrat[ed] no difficulty with the encoding, storage, or retrieval of well-structured auditory information. However, for less structured and more complex information, he demonstrates a slow speed of encoding, but adequate retention over time." (AR 483). Dr. Biggan suggested Plaintiff may have suffered from a mild brain injury but stated she "d[id] not have any medical records or imaging that might help delineate the severity of any brain injury." (AR 483). Dr. Biggan also noted Plaintiff "now has chronic pain, and the effects of both pain and pain medication may also slow processing speed and affect executive functions." (AR 483). Dr. Biggan recommended Plaintiff continue seeing his physicians for pain issues, seek therapy for his depression, anxiety and chronic pain, take extra time with tasks and use a daily planner to improve his organization and minimize demands on recall. (AR 484).

In January 2006, Plaintiff paid a thousand dollars for an evaluation by Drs. Thomas McCabe and Denny Peck. (AR 59). The report indicates they reviewed Plaintiff's record and interviewed him twice. (AR 488-493). They did not perform any psychological testing, instead giving their own interpretations of Dr. Biggan's testing results. (AR 488-493). Drs. McCabe and Peck also completed a PRTF that varies greatly from the other psychologists' reports. (AR 494-507). They found Plaintiff met the listing for affective disorders, anxiety-related disorders and personality disorders. (AR 494). They found Plaintiff had marked restrictions of his daily activities and marked difficulties in maintaining social functioning. (AR 504). They also found Plaintiff had extreme difficulties in maintaining concentration, persistence or pace and four or more episodes of decompensation. (AR 504). In April 2006,

Dr. McCabe again evaluated Plaintiff, this time at the request of the SSA. (AR 540-546). Dr. McCabe did not reveal that he had previously examined Plaintiff and while he referenced his prior report from January 2006, he identified only Dr. Peck as having created the report. (AR 540). As expected, Dr. McCabe's second evaluation and MSS closely aligned with his first assessment. (Compare AR 488-493 with AR 540-546).

At the request of the ALJ, Plaintiff underwent a psychological evaluation in June 2006 performed by Dr. Francisco Sanchez. (AR 520-527). Dr. Sanchez performed the same tests as previously performed by Dr. Biggan. Plaintiff showed some improvement in his scores, which Dr. Sanchez opined could be attributable to retest practice efforts or mild improvement in verbal reasoning and cognition. (AR 526). Dr. Sanchez stated Plaintiff's "ability to communicate was effective and his ability to understand with [sic] within normal limits." (AR 525). Dr. Sanchez found "[b]ased on the psychometric findings, Mr. Malusa appears to be functioning within the average range . . ." (AR 526). In a MSS, Dr. Sanchez opined Plaintiff had slight limitations in the ability to understand, remember, and carry out detailed instructions as well as slight limitations to interact appropriately with supervisors or co-workers and respond appropriately to changes in a routine work setting. (AR 520-521). Dr. Sanchez also found Plaintiff moderately limited in his ability to respond appropriately to work pressures in a usual work setting. (AR 521). Plaintiff had no limitations in his ability with simple instructions, judgements on simple work-related decisions, and interacting appropriately with the public. (AR 521).

Plaintiff has complained of disabling pain and mental difficulties. His orthopedic surgeon, Dr. Baron, and his pain management specialist, Dr. Davis, have both written letters opining Plaintiff is unable to work because of his difficulties. Despite his conservative treatment of Plaintiff, Dr. Baron wrote to Plaintiff's attorney in April 2005, opining Plaintiff's "ongoing pain makes him unable to work in a sedentary capacity without substantial interruptions in any daily routine." (AR 273). Dr. Baron did note Plaintiff has "done fairly well" in his progress. (AR 273). In December 2005, Dr. Davis wrote Plaintiff's attorney a letter in which he opined Plaintiff has "persistent severe pain from a spinal

1  compression fracture that will prevent him from performing any type of work, even
2  sedentary jobs, on a full term basis." (AR 509). Dr. Davis further stated Plaintiff "has
3  depression, anxiety, and obsessive-complusive disorder that is severe enough to prevent him
4  from performing any type of work on a full term basis, even sedentary." (AR 509). Dr.
5  Davis based his opinion, in part, on the conclusions drawn by Dr. Biggan in her November
6  2005 neuropsychology evaluation. (AR 509). Significant to Dr. Davis's opinion, Dr.
7  Biggan opined Plaintiff may have suffered a brain injury in the accident. Dr. Davis appears
8  to assume Dr. Biggan proved Plaintiff had a brain injury. In his letter to Plaintiff's attorney,
9  Dr. Davis stated "[Dr. Biggan] clearly demonstrated cognitive deficits related to [Plaintiff's]
10 motor vehicle accident/closed head injury . . ." (AR 509). The record does not reveal any
11 evidence of a medically determinable impairment of a closed head injury. In fact, Dr.
12 Biggan even noted the record does not support evidence of a brain injury. (AR 483).
13 Plaintiff did not complain of a head injury in his initial appointments after his accident in
14 Mexico and no brain scans or other objective medical evidence proves a brain injury.

15       While Plaintiff complains of disabling pain and mental difficulties, he lives an
16 independent, relatively active life. At the time of the administrative hearings, two years
17 after his motor vehicle accident, Plaintiff continued to maintain a twenty-six foot boat in
18 Mexico. (AR 42). Subsequent to his accident, Plaintiff travels to Mexico at least three
19 times a year. (AR 42). The time it takes Plaintiff to reach his boat in Mexico has increased
20 by two hours. Prior to his accident Plaintiff could drive to his destination in five and a half
21 hours. Now Plaintiff must take five to ten minute breaks for his back and the drive takes
22 seven and a half hours. (AR 45, 73). While he takes the boat out less frequently, he fishes
23 from the boat when he takes it out. (AR 42). In April 2005, Plaintiff told his psychologist,
24 Dr. Volkerts that while recently down in Mexico on his boat that the "waves aggravated his
25 back pain." (AR 280). As of the second administrative hearing, Plaintiff testified he had
26 only put 20 hours of use on his boat's engine. Plaintiff, however, also testified he traveled
27 down to Mexico and went out on his boat between the first and second administrative
28 hearings. (AR 73).

In addition to his Mexico trips, Plaintiff maintains an independent life at home in Tucson. Plaintiff lives alone, manages his daily hygiene, cooks and does light chores including light cleaning, laundry, and occasional yard cleaning. (AR 44, 46, 242). Plaintiff performs daily routines as well, having coffee in the morning, watching the news, organizing his day, grocery shopping and attending appointments. (AR 46). Plaintiff also visits friends, goes out to dinner and swims in his pool. (AR 244, 524).

The ALJ found Plaintiff had a L2 burst fracture, adjustment disorder, mixed with depression and anxiety and a mood disorder secondary to medical condition. (AR 29). At step four, however, the ALJ found Plaintiff retained the residual functional capacity ("RFC") to perform a range of light work. 20 C.F.R. § 404.1545.

## Standard of Review

The Commissioner employs a five-step process to evaluate DIB claims. 20 C.F.R. §§ 404.1520, 416.920; *see also Heckler v. Campbell,* 461 U.S. 458, 460-462 (1983). The Commissioner considers, in order, whether the claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work. *Id.* If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. *Id.*

Claimant in this case was denied at step four of the evaluation process. Step four requires a determination of whether the claimant has sufficient residual functional capacity ("RFC") to perform past work. 20 C.F.R. §§ 404.1520(e), 416.920(e). Residual functional capacity is defined as that which an individual can still do despite his limitations. 20 C.F.R. § 404.1545. If the ALJ concludes that the claimant has RFC to perform past work, then the claim is denied. 20 C.F.R. § 404.1520(f) The Commissioner determines a claimant's RFC as it is an administrative finding, not a medical finding. 20 C.F.R. § 404.1527(e)(2), *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir.2001). An RFC finding is based on the

record as a whole and it is not required to be the same as the limitations assessed by any particular medical source in the record.  Social Security Ruling ("SSR") 96-8p.

The findings of the Commissioner are meant to be conclusive.  42 U.S.C. §§ 405(g), 1383(c)(3).  The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir.2001).  As set forth in 42 U.S.C. § 405(g), "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . ."  Substantial evidence is "more than a scintilla but less than a preponderance."  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir.1999).  "If the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ."  *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir.1992).  The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence.  *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir.1998).  When applying the substantial evidence standard  the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly.  Reviewing courts must consider the evidence that supports as well as detracts from the Commissioner's conclusion.  *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir.1975).

In this case, Plaintiff alleges the ALJ erred by (1) evaluating Plaintiff's physical condition; (2) evaluating Plaintiff's mental condition; and (3) determining Plaintiff could perform his past relevant work.

**The ALJ Did Not Err in Determining Plaintiff Could Physically Perform Light Work**

The regulations describe light work as

involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

- 11 -

1  In his decision, the ALJ first found Plaintiff could physically lift and/or carry 20 pounds occasionally, 10 pounds frequently, stand and/or walk 6 hours with breaks during an eight hour workday, and sit continuously with breaks every two hours for six hours in an eight hour workday with alternation of positions from sitting and standing provided sufficiently with normal breaks and with no climbing ladders, ropes, or scaffolds and avoidance of concentrated exposure to airborne irritants and hazards.

Plaintiff disputes the ALJ's finding that he could physical perform light work. Plaintiff argues the ALJ improperly discounted the opinions of Drs. Baron and Davis that Plaintiff could not perform sedentary work on a full-time basis.

The ALJ may reject the opinion of a treating physician, whether or not controverted. *Andrews v. Shalala,* 53 F.3d 1035, 1041 (9th Cir. 1995). To reject the opinion of a treating physician which conflicts with that of an examining physician, the ALJ must "'make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.'" *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987), (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir.1987). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir.1986).

The ALJ in the case before this Court set out a detailed and thorough summary of facts that show the opinions of Drs. Baron and Davis that Plaintiff could not perform sedentary work are not supported by substantial evidence in the record. The ALJ noted Dr. Baron's treatment notes revealed conservative treatment of Plaintiff including physical therapy and some medication to limit the pain. The ALJ also noted Dr. Davis's opinion relied, in part, on an unsubstantiated brain injury hypothesized by Dr. Biggan. Also, Plaintiff showed improvement. Physical observations by treating and examining doctors revealed Plaintiff ambulated in an upright and steady manner. Plaintiff exhibited a normal gait and doctors routinely found his alignment was within normal limits and that he had no

- 12 -

1  significant canal encroachment. An MRI eleven months after the accident showed an L2
2  fracture that appeared to have healed.

3        The medical evidence is aligned with Plaintiff's personal behavior as noted by the
4  ALJ. Plaintiff's morning routine includes making coffee, reading the paper, and planning
5  for his day. Plaintiff travels down to Mexico and maintains a boat that he takes out for
6  fishing. While he does all of this less frequently than before his accident, he is still able to
7  travel to Mexico at least three times a year. Furthermore, Plaintiff lives independently. He
8  maintains his hygiene, cooks, does light chores and performs a daily routine. Plaintiff also
9  attends appointments without assistance, visits friends weekly, goes out to dinner and swims
10 in his pool every other day.

11       Plaintiff also managed the restoration of a ten apartment complex for twenty-two
12 months. He hired the workers, managed the finances, paid the bills, and controlled the
13 direction of the project including making management decisions. Plaintiff then sold the
14 building for a $50,000 profit.

15       Given Dr. Baron's conservative medical treatment of Plaintiff, Dr. Davis's reliance
16 on an unsubstantiated brain injury in reaching an opinion about Plaintiff and Plaintiff's
17 relatively active and productive lifestyle, substantial evidence supports the ALJ's decision to
18 discount the opinions of Drs. Baron and Davis. The ALJ's finding that Plaintiff could
19 perform light work is supported by substantial evidence in the record, which the ALJ
20 outlined in his opinion. The ALJ did not err in reaching this decision.

21 **The ALJ Did Not Err in Determining Plaintiff Could Mentally Perform Light Work**

22       When assessing a claimant's mental RFC, the ALJ must consider "the nature and
23 extent of [claimant's] mental limitations and restrictions and then determine [claimant's]
24 residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. §
25 404.1545(c). Moderate limitations in several categories of mental functioning is not
26 necessarily evidence of disabling limitations. *Hoopai v. Astrue*, 499 F.3d 1071, 1076-1077
27 (9th Cir.2007) (a step five decision). The ALJ is the final arbiter in resolving ambiguities in
28 the medical evidence. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir.2008).

In his decision, the ALJ found Plaintiff suffered from adjustment disorder, mixed with depression and anxiety and a mood disorder secondary to medical condition. Based on this finding and the evidence in the record, the ALJ found Plaintiff had moderate limitation in his ability to respond appropriately to work pressures in a usual work setting; slight limitations in the ability to understand, remember and carry out detailed instructions, interact appropriately with supervisors and co-workers and respond appropriately to changes in a routine work setting; and no limitations in the ability to understand, remember and carry out simple instructions, make judgments on simple work-related decisions and interact appropriately with the public. Plaintiff argues his limitations are more significant than defined by the ALJ and inconsistent with the ALJ's finding that he can perform skilled work. The Commissioner argues the ALJ's conclusions are supported by the substantial evidence in the record, particularly with Dr. Sanchez's assessment of Plaintiff's mental health.

The ALJ's determination of Plaintiff's mental RFC is supported by substantial evidence in the record. The record shows Plaintiff lives independently and had little difficulty performing basic adaptive activities of daily living such as cooking, light cleaning, visiting friends and maintaining a daily routine. Plaintiff possessed the mental acumen to manage, restore and profitably sell a ten apartment complex all within the first twenty-two months after his accident. In managing the complex restoration, Plaintiff had to develop a plan for the restoration, hire workers to do the manual labor, pay the bills, determine progress on the project, troubleshoot problems and make management decisions.

Plaintiff's treating psychologist, Dr. Volkerts, opined Plaintiff was not disabled in December 2004 and in April 2005, Dr. Volkerts again opined Plaintiff's impairment was not severe. Dr. Volkerts found some moderate impairment, but found in December 2004 that Plaintiff exhibited no evidence of limitation and was not significantly limited in eighteen of twenty categories assessing a claimant's ability to work. In April 2005, Dr. Volkerts identified a couple additional areas of moderate limitation but found Plaintiff not limited or not significantly limited in fourteen of the categories. When Dr. Sanchez evaluated Plaintiff

in June 2006, he found Plaintiff communicated effectively and understood within normal limits.

Psychological tests and assessments of Plaintiff substantially show Plaintiff experiences some mental limitation but is not disabled or significantly impaired. Plaintiff completed a standardized test of intellectual function (WAIS-III) twice. In both instances, Plaintiff scored within the average range of function relative to his peers. While Plaintiff demonstrated a slow speed on encoding complex information, he exhibited adequate retention over time.

The substantial evidence of the record including the medical evidence supports the ALJ's assessment of Plaintiff's mental RFC.

Plaintiff also argues the ALJ erred in rejecting the opinion of Drs. McCabe and Peck as to Plaintiff's mental condition. Drs. McCabe and Peck were paid a thousand dollars by to Plaintiff to assess him. In providing their assessment, Drs. McCabe and Peck did not perform any of their own psychological testing, they relied on the results of Dr. Biggan's testing. Drs. McCabe and Peck only interviewed Plaintiff and reviewed the record before offering their opinion. Their assessment of Plaintiff varied greatly from the other doctors' assessments as well as other substantial evidence in the record. They found marked limitations in Plaintiff's daily living and extreme difficulties in maintaining concentration, persistence, and pace. No other doctor found such a degree of limitations. Plaintiff's own testimony that he maintains a daily routine goes against the doctors' finding. Plaintiff wakes up every morning and makes a cup of coffee, plans his day, watches the news, and proceeds to do light chores, grocery shopping, visiting, friends, swimming, and going out to dinner. Plaintiff also lives independently, manages his household with only some help for cleaning, and travels to Mexico three times a year. In addition, Plaintiff managed the restoration of a ten apartment complex and profitably sold it at completion. The ALJ did not commit legal error in rejecting the opinions of Drs. McCabe and Peck. The ALJ's rejection of their evidence is supported by the substantial evidence in the record.

**The ALJ Did Not Err in Determining Plaintiff Could Perform His Past Relevant Work**

Past relevant work is work that Plaintiff "has done in the last fifteen years, that was substantial gainful activity, and that lasted long enough for claimant to learn how to do it." 20 C.F.R. § 404.1560(b)(1). This is step four of the social security analysis framework. A claimant is not disabled at step four if the claimant can perform his past relevant work "either as the claimant actually performed it or as generally performed in the national economy." 20 C.F.R. § 404.1560(b)(2), SSR 82-61. The claimant has the burden to prove that he cannot perform his prior relevant work "either as actually performed or as generally performed in the national economy." *Lewis v. Barnhart*, 281 F.3d 1081, 1083 (9th Cir.2002).

The Dictionary of Occupation Titles ("DOT") is the "best source for how a job is generally performed." *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir.2001). In classifying prior work, the agency must keep in mind that every occupation involves various tasks that may require differing levels of physical exertion. It is error for the ALJ to classify an occupation "according to the least demanding function." *Valenica v. Heckler*, 751 F.2d 1082, 1086 (9th Cir.1985). DOT descriptions "can be relied upon–for jobs that are listed in the DOT–to define the job as it is *usually* performed in the national economy." SSR 82-61 (emphasis in original). When significant variation exists between Plaintiff's description of his job and the DOT description of his job, it may be the result of a composite job. *Id.* A composite job has "significant elements of two or more occupations, and as such, ha[s] no counterpart in the DOT." *Id.*

Plaintiff first argues the ALJ's decision is ambiguous as to which basis the ALJ determined Plaintiff could perform his past relevant work; whether the ALJ's decision was based on Plaintiff past work as actually performed or as generally performed in the national economy. It is evident from the ALJ's opinion, that he assessed Plaintiff's ability to perform the work as generally performed in the national economy. In the opinion the ALJ stated Plaintiff's past work as a restoration company president as described by Plaintiff was

- 16 -

"medium to heavy work even though [Plaintiff] stated he spent 90% of his time supervising others." (AR 28). The ALJ proceeded to find Plaintiff's past relevant work closest in description to company president/supervisor in Dictionary of Occupational Titles at 189.117-026, which is light work as performed in the national economy.

The DOT describes the duties of "president (any industry)" as planning, developing, establishing policies and objectives of the business. DICOT 189.117-026. Conferring with company officials about the business. *Id.* Reviewing reports and finances and overseeing the productivity of the company. *Id.* The President is also charged with evaluating the performance of his employees. *Id.* Plaintiff disputes that his job a president of TM Building and Development matches this description. He argues his job is more akin to a composite job, having significant elements of two or more occupations and therefore not able to be defined in the DOT.

Plaintiff relies on two cases to support his position that his job is a composite job. *Valenica v. Heckler*, 751 F.2d 1082, 1086 (9th Cir.1985), *Carmickle v. Commissioner, Soc. Sec. Admin.*, 533 F.3d 1155 (9th Cir.2007). In *Valencia*, the claimant worked for eight years as a kitchen helper and two years as an agricultural worker. 751 F.2d at 1086. Both occupations required significant manual labor including lifting heavy machinery and farm field work, classified as medium work. *Id.* Part of her job as an agricultural worker was sorting tomatoes. Tomato sorting was "light work" and therefore claimant's disability claim was denied because she could perform light work. The Ninth Circuit reversed the decision, holding a job could not be classified by its least demanding function. *Id.* In *Carmickle*, the claimant was a carpenter who remodeled houses and as part of his job supervised a crew of other carpenters. 533 F.3d at 1166. The claimant stated his supervisory duties comprised twenty percent of his time with the remaining eighty percent dedicated to manual labor. *Id.* The ALJ classified the claimant with a position in the DOT that was purely supervisory and required no manual labor. The Ninth Circuit disagreed with the categorization. It held

"[o]nly 20 percent of [the claimant's] duties as a construction supervisor involved supervision. The remainder of his time was spent performing manual labor." *Id*.

Plaintiff's position is distinct from the position of the claimants in *Valencia* and *Carmickle*. Plaintiff stated he spent ninety percent of his time supervising his employees. Plaintiff ran a company that had fifty to seventy employees. Plaintiff described extensive management duties including managing an office of ten to fifteen employees, thirty-five to forty-five field employees and approximately ten to fifteen subcontractors at any given time. Plaintiff's position was correctly categorized and as generally performed in the national economy only required light work.

Alternatively, Plaintiff argues that his job is more akin to that of a supervisor of a home restoration service. Plaintiff ran a profitable business that maintained fifty to seventy employees and was sold for over a million dollars. Plaintiff was the president and sole shareholder of this business. Plaintiff was not a supervisor.

Finally, Plaintiff argues he does not have the mental abilities to perform his past relevant work as president of a company even given the ALJ's RFC assessment of his mental abilities. The ALJ found Plaintiff had slight limitations in his abilities with detailed instructions and interacting with people and changes in work environment as well as a moderate limitation in his ability to respond appropriately to work pressures in a usual work setting. The job of a president, as defined by the DOT, requires planning, developing, and establishing the policies and objectives of the business as well as reviewing reports, including financial ones, to determine progress on objectives and makes necessary changes as well as planning for the future and evaluating employees. DICOT 189.117-026. The work requires a level 5 of reasoning. Using that level of reasoning requires applying principles of logical or scientific thinking to define problems, collecting data, establishing facts, and drawing valid conclusions. *Id*. It also requires interpreting an extensive variety of technical instructions in mathematical or diagrammatic form and dealing with several abstract and concrete variables. *Id*.

Plaintiff contends because he has slight limitations in working with detailed tasks and a moderate limitation in dealing with work stress that he is unable to do work that requires level 5 reasoning. In fact, Plaintiff argues because he has slight limitations in his ability to do detailed tasks, he can only perform at a reasoning level 2, which is applying commonsense understanding to carry out detailed but uninvolved written or oral instructions; dealing with problems involving a few concrete variables in or from standardized situations. DICOT, App. C.

Whether Plaintiff has the mental RFC to perform his past relevant work as a company president is the closest question in this case. The state's own reviewing psychologist, Dr. Tageman, opined Plaintiff retains only "the ability to sustain basic work tasks in a low stress situation that is not fast paced." (AR 305). The DOT does not offer indications of the stress experienced by a company president nor whether the environment is fast paced. Yet, an ordinary understanding of the job would assume a certain amount of stress and work environment pace for a company president.

With that said, Plaintiff's abilities to work with detailed tasks are only slightly limited. Plaintiff worked with these limitations when he purchased the ten apartment complex just after his accident and renovated it. The renovation required Plaintiff to oversee the project, problem-solve issues that arose which were brought to his attention by his hired supervisor of the project, and manage the complex financially including paying for the materials and paying employees.

Plaintiff has shown he can handle the stress of working in his past relevant work, even with a moderate limitation in his ability to respond appropriately to work pressures in a usual work setting. The medical records do not show that Plaintiff increased his medication or was somehow unable to appropriately deal with the stress of renovating the complex. After Plaintiff completed the complex, he successfully sold it for a $50,000 profit.

Courts will only overturn an ALJ's findings when those findings are based on a clear error of law or not supported by substantial evidence in the record. *Aukland*, 257 F.3d at

1035. When the evidence can support either outcome "the court may not substitute its judgment for that of the ALJ." *Matney*, 981 F.2d at 1019.  The ALJ presented clear reasons for finding Plaintiff had the mental RFC to perform his past relevant work.  The ALJ then supported his reasoning with substantial evidence from the record.  While there are logical concerns about whether this case was appropriately determined at step 4, specific aspects of the record, cited by the ALJ, refute those concerns.  Substantial evidence in the record supports the ALJ's conclusion that Plaintiff could mentally perform his past relevant work.

## **Recommendation**

For the foregoing reasons, the Magistrate Judge recommends that the District Court, after its independent review:

1. Deny Plaintiff's Motion for Summary Judgment (Doc 7);

2. Grant Defendant's Motion for Summary Judgment (Doc 13).

Pursuant to 28 U.S.C. § 636(b), any party may file and serve written objections within 10 days after being served with a copy of this Report and Recommendation.  If objections are not timely filed, the party's right to de novo review may be waived.  If objections are filed, the parties should direct them to the District Court by using the following case number: CV-07-655-TUC-CKJ.

The Clerk of the Court is directed to send a copy of this Report and Recommendation to all parties.

DATED this 2nd day of March, 2009.

CHARLES R. PYLE
UNITED STATES MAGISTRATE JUDGE